SHELDON P. BARR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barr v. Commissioner
Docket No. 30270-86
United States Tax Court
T.C. Memo 1995-120; 1995 Tax Ct. Memo LEXIS 116; 69 T.C.M. (CCH) 2155; March 22, 1995, Filed *116 Decision will be entered under Rule 155. Sheldon P. Barr, pro se. For respondent: Nancy M. Vinocur and John Aletta. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was heard by Special Trial Judge Daniel J. Dinan pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE DINAN, Special Trial Judge: Respondent determined a deficiency in petitioner's Federal income tax and additions to tax for the year 1982 as follows: Additions to Tax and
Additional Interest
Year
Deficiency
Sec. 6659
Sec. 6661
Sec. 6621(d)
1982
$ 183,368
$ 12,422
$ 14,195
120% of the  adjusted rate
due on $ 7,133
In addition, by *117 amendment to answer filed December 21, 1993, respondent asserted additions to tax pursuant to section 6653(a)(1) and (2), and an increased addition to tax pursuant to section 6661. On February 8, 1988, the parties filed a Stipulation of Settlement pertaining to some issues. The issues remaining for decision are: (1) Whether petitioner is entitled to claim a partnership loss, an investment tax credit, and a business energy investment credit because of his alleged participation as a limited partner in Nutmeg Associates #2 Limited Partnership (Nutmeg 2); (2) whether petitioner is liable for additions to tax pursuant to sections 6659 and 6661; (3) whether petitioner is subject to the provisions of section 6621(d) which is now section 6621(c); (4) whether petitioner is liable for additions to tax pursuant to section 6653(a)(1) and (2); and (5) whether petitioner is liable for an increased addition to tax pursuant to section 6661. The burden of proof is on respondent with regard to issues (4) and (5) which constitute new matter raised by respondent in an amendment to answer. Rule 142(a). FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of fact and accompanying *118 exhibits are incorporated herein by this reference. Petitioner resided in Baldwin, New York, when he filed his petition in this case. In 1982, petitioner was a practicing attorney in the law firm of Barr & Bell, 370 Seventh Avenue, New York, New York. In 1981, petitioner caused to have incorporated a firm called Enersonics. He was the secretary of the firm. Enersonics advertised itself to be the manufacturer of an "Energy Brain" but, in fact, Enersonics had no manufacturing facilities. Its address was 370 Seventh Avenue, New York, N.Y., the location of petitioner's law firm. Enersonics did, however, purchase Energy Brains from Frank Leja, who manufactured Energy Brains in Massachusetts at a firm known as CS&M. The Energy Brain is a microprocessor which is programmed to transmit energy savings directives to the energy-consuming equipment being utilized. The unit controls and monitors energy input for heating, air conditioning, and electrical usage. The Saxon Energy Corp. (Saxon) was incorporated in 1981 and was established to purchase from Enersonics the systems obtained by Enersonics from CS&M. Saxon would then lease the energy systems to third parties. Archibald U. Braunfeld, *119 a certified public accountant, was chairman of the board of Saxon. Saxon's address was 21 East 40th Street, New York, N.Y, which was the office of a certified public accounting firm named Braunfeld & Davitian. Petitioner actively participated in the business affairs of Saxon. In October 1982, Enersonics and Saxon entered into an agreement (the agreement) which provided that Enersonics would sell exclusively to Saxon all of the energy conservation systems manufactured [2] by it for the period beginning October 1982 and ending December 31, 1984. Saxon agreed that it would not purchase, sell or lease energy conservation systems or equipment manufactured by any other supplier. The agreement provided that the purchase prices for the various systems and the terms of payment were as follows: a. System 1 - $ 80,000.00 payable as follows: $ 4,000 payable upon ordering of the equipment and the balance by a 25-year note. b. System 2 - $ 240,000.00 payable as follows: $ 11,450.00 payable upon ordering of the equipment and the balance by a 25-year note. c. System 3 - $ 480,000 payable as follows: $ 22,900.00 payable upon ordering of the equipment and the balance by a 25-year note. d. *120 System 4 - $ 720,000 payable as follows: $ 34,320.00 payable upon order of the equipment and the balance by 25-year note. e. System 5 - $ 960,000 payable as follows: $ 45,800.00 payable upon ordering of equipment and the balance by a 25-year note. A brochure provided by Saxon to potential lessees of its energy systems stated, inter alia: MARKETING OF THE SYSTEM The Lessee will be responsible for the (sic) marketing the energy savings produced by the system. The Lessee may retain a qualified service company to locate a potential user on behalf of the Lessee. However, the Lessee is free to do his own marketing if he so desires. Installation of the system at the site designated by the Lessee, and service maintenance for the first 12 months are included in the Lease rental and will be arranged for by SEC[;] thereafter, said functions become the responsibility of the Lessee. *121 There are service companies available who will perform the functions of placing the system[,] maintaining it, and collecting the users payments, as well as auditing users['] savings for a fee of approximately 15% of Lessee's receipts from the user of the system. * * * DESCRIPTION OF THE "ENERGY BRAIN" The Energy Brain is a computer system which consists of an intelligent computer "cycle type heating control timer." The brain's time computer controls a building's heating system, based upon actual heat loss for a given outdoor temperature. It computes the required "On Time" in percentages of a full heating cycle, and varies the "On Time" with the changing outdoor conditions. The Brain is fed information from Transmitting (sensing) devices which are a part of the system, relating to temperature and outdoor conditions which transmitters, format (sic) into form for the computer to act upon. With this information, the computer through an Interfacing Unit regulates the heating plant in the building. The "Energy Brain" will provide for the minimum necessary heating and most efficient operation of the users['] heating plant to keep the temperature at a comfortable level for the occupants *122 of the building. The "Energy Brain" is available in the following five configurations: 001. The simplest system regulates heating. 002. Regulates heating, but is a more sophisticated system. 003. Regulates heating and air conditioning. 004. Regulates heating and air conditioning as well as having the capacity to provide for periods when a building is not occupied such as holidays, weekends, etc. by turning down the temperature to lowest point which will still prevent freezing, condensation, etc. and can be programmed to compute the minimum necessary time to start up the user's heating or air conditioning unit to bring the condition of the premises to the minimum required for comfortable starting of the work day without expensive waste of fuel. 005. Is a more comprehensive unit which, in addition to containing the features of 004 is larger and more sophisticated. It has the capabilities to effectuate efficiencies for the user's production machinery. * * * "ENERGY BRAIN" EQUIPMENT LEASING PROGRAM FIRST YEAR ESTIMATED TAX WRITEOFF ILLUSTRATION Fair Advance
Investment
Tax [2] Market Lease
& Energy
Equivalent
Savings
Positive [1]
Value
Payments [2]
Credits Deduction
Multiple
50%
Cash 80,000
10,000
16,000
42,000
4.2 21,000
11,000
240,000
28,600
48,000
124,600
4.36
62,300
33,700
480,000
57,200
96,000
249,200
4.36
124,600
67,400
720,000
85,800
144,000
373,800
4.36
186,900
101,100
960,000
114,400
192,000
498,400
4.36
249,200
135,200
*123 ALH was a service corporation which allegedly entered into energy systems management agreements with Saxon's lessees. It was located at petitioner's law offices at 370 Seventh Avenue, New York, New York. Sometime during the beginning of 1982, Kamal Fereg (Fereg) was hired by petitioner through an unemployment agency. A few months after he was hired, Fereg was designated president of ALH by petitioner. In 1982, Fereg was the only employee of ALH. The business affairs of ALH were conducted by petitioner, and Fereg's activities as president of ALH were directed by petitioner. Petitioner prepared and submitted to Fereg for his signature two letters dated January 27, 1982. Both letters were prepared on letterhead that read: Kamal M. Fereg Engineering Consultant 2700 Kennedy Blvd. #414 Jersey City, New Jersey 07306 201-451-7514 Both letters were addressed to Saxon Energy Corp., 21 East 40th Street, New York, New York 10016. While one of the letters contained much more information than the other, pertaining to the "Enersonics Systems 001, 002, 003, 004, and 005 automatic energy control systems", each letter represented the fair market values of the systems to be at least: *124 $ 80,000 for 001 system $ 240,000 for 002 system $ 480,000 for 003 system $ 720,000 for 004 system One of the letters valued the 005 system at $ 860,000, and the other letter valued the same system at $ 960,000. Fereg had not provided any of the data or information contained in the January 27, 1982, letters. He made no independent evaluation of the systems valued in the letters. The January 27, 1982, letters were given to potential investors in the Saxon Energy Program. When Fereg signed the January 27, 1982, letters, he had never seen an energy management system or an energy brain. During 1982, at the direction of petitioner, Fereg, on behalf of ALH, purchased Tour and Anderson's 210C energy brains for approximately $ 500 or $ 600 and affixed Enersonic labels to them. On December 23, 1982, Charles J. Davitian (Davitian), as the general partner, and petitioner, as a limited partner, filed in the State of New York a Certificate of Limited Partnership for Nutmeg Associates #2 Limited Partnership. The stated purpose of the partnership was to provide management services in the field of energy conservation, including the owning, leasing and/or exploitation of energy conservation *125 equipment and other related activities. Davitian was a certified public accountant and a partner in the certified public accounting firm of Braunfeld & Davitian in New York, New York. Petitioner alleges that he made a $ 20,000 contribution to the capital of Nutmeg 2 prior to December 31, 1982. He further alleges that, prior to December 31, 1982, Saxon and Enersonics had entered into a contract pursuant to which Saxon purchased from Enersonics an energy system for $ 1,700,000. Petitioner then states that Nutmeg 2 rented the system from Saxon and paid Saxon a $ 195,000 advance rental payment. Petitioner next alleges that, prior to December 31, 1982, Saxon and Nutmeg 2 executed an agreement by which Saxon passed through to Nutmeg 2 its entitlement to the investment and energy tax credits resulting from the purchase by Saxon of the energy system. Petitioner also informed the Court that the energy system leased by Nutmeg 2 from Saxon was placed in service at Bob Brown Chevrolet, Inc. (Brown), in Iowa in 1983. He states that the equipment was placed in Brown by Iowa Energy Consultants (Iowa) which, petitioner alleges, was a subcontractor of ALH. On its 1982 U.S. Partnership Return *126 of Income, Nutmeg 2 reported a guaranteed payment of $ 2,500, other deductions of $ 2,500, and a rental advance payment of $ 195,000, resulting in a loss of $ 200,000. It also reported that it had an unadjusted basis in qualified investment property in the amount of $ 1,700,000. On his 1982 joint Federal income tax return, petitioner reported a pass-through loss of $ 19,800 from Nutmeg 2, an investment tax credit of $ 17,445, and a business energy investment credit of $ 16,830, all of which were disallowed by respondent. Petitioner states that Nutmeg 2 retained ALH as its management agent for its energy system and that ALH in turn hired Iowa as its agent. Therefore, petitioner argues that Iowa in 1983 entered into an agreement with Brown on behalf of Nutmeg 2 to install and service an energy system on Brown's premises in Iowa. In 1979, Arthur Jones (Jones) founded the company known as Iowa Energy Consultants (Iowa). He continued to be the owner of Iowa at the time of trial. In 1980, a salesman who worked for Jones contacted Bob Brown Chevrolet, which was located in Des Moines, Iowa, to sell it an energy management system. In May or June of 1980, Iowa prepared an Energy Management *127 Analysis report for Brown. The objective of the Iowa report was: Providing a turnkey system from preliminary engineering and project layout, to installation, service, maintenance, and operation of the project. This service will include all program changes required, production of specified energy management reports and training of on-site personnel. The price of the program proposed by Iowa to Brown was $ 42,000. Jones stated that the $ 42,000 included everything: Obviously the design of the system -- by "system", I mean all the wiring, peripherals, stuff like that -- labor to install all of that, the energy management computers, basically anything that was needed to accomplish what we had set forth in the proposal. The $ 42,000 price included two energy management systems. The proposal contemplated that Brown would own the energy management systems. Brown did not accept Iowa's May/June 1980 proposal. Brown, however, was still interested in having energy management equipment installed. Jones then contacted Frank Leja, who manufactured energy management systems in Massachusetts under the company name of CS&M, to determine what energy systems were available to fulfill *128 Brown's needs. On April 11, 1983, Brown entered into an agreement with Iowa which provided that Iowa would install energy equipment at Brown that it had acquired from Frank Leja. The agreement, however, listed the owner of the energy equipment as Saxon. Jones had never heard of Nutmeg 2 when he entered into the April 11, 1983, agreement with Brown. Iowa installed two energy units at Brown -- an EB-3 and an EB-4. At the time of trial, Iowa was still servicing the energy systems. Jones did ultimately deal with petitioner, as a representative of Saxon, in obtaining the energy equipment. At the time of the April 11, 1983, agreement, Jones had never heard of ALH. The April 11, 1983, agreement provided that Saxon would be paid 50 percent of the energy savings effected by the installation of the energy systems. Iowa was to receive 15 percent of Saxon's 50-percent earnings from the energy savings. Iowa had no agreement to share its 15-percent commission with anyone. Iowa was the sole servicer of the Brown energy system. In 1985, when Iowa sent to Saxon an energy savings check pursuant to the terms of the April 11, 1983, agreement, the check was returned to Iowa by Saxon with instructions *129 that the check be reissued to ALH. Davitian who, as we have previously noted, is a certified public accountant, was the general partner of Nutmeg 2 which was formed in 1982. His responsibilities as general partner of Nutmeg 2 were to maintain the records of the partnership and to prepare its tax returns. He received all of his information for the maintenance of Nutmeg 2's books of account and for the preparation of Nutmeg 2's tax returns from petitioner. All of the financial operations of Nutmeg 2 were orchestrated by petitioner. Nutmeg 2's office was located at Davitian's office at 21 East 40th Street, New York, New York. He never saw a lease that allegedly had been executed between Saxon and Nutmeg 2. He did all that he was told to do by petitioner pertaining to the alleged business affairs of Nutmeg 2. Nutmeg 2 never received any investor's funds pertaining to any energy systems. The $ 195,000 advance rental payment allegedly made by Nutmeg 2 to Saxon was never disbursed through any Nutmeg 2 account. In 1986, a grand jury of New York County returned an indictment against petitioner, Leonard Freedman, Kamal Fereg, Charles Taylor, Frank Leja, Saxon Energy Corp., Enersonics, *130 Inc., and ALH Energy Management Corporation. The indictment charged the defendants, inter alia, with conspiracy to defraud in the first degree in an Energy Brain Leasing Program. The indictment alleged, in part, in Count One: It was a purpose of the conspiracy to obtain money from the public by fraudulent means. In furtherance of this purpose the conspirators agreed to misrepresent the fair market value of the Energy Brain Equipment. The conspirators further agreed to cooperate in the leasing of the overvalued Energy Brain Equipment to the public. The conspirators agreed to conceal the fair market value of the Energy Brain Equipment. The conspirators agreed to obtain money from the public by leasing the overvalued Energy Brain equipment. The conspirators agreed that the Energy Brain equipment leased to the public by Saxon would be purchased from Enersonics, who obtained the Energy Brains from Frank Leja. The conspirators agreed that Archibald Braunfeld, a Certified Public Accountant, would act as the President of Saxon. The conspirators agreed that Archibald Braunfeld would be a figurehead President and that Saxon would be falsely represented as "independent." The conspirators *131 agreed to misrepresent Saxon as "independent" falsely representing that there was an "arms length transaction" between Saxon and Enersonics, the seller of the Energy Brain. The conspirators agreed to conceal Sheldon Barr's control of Saxon and the collusion between Saxon and Enersonics. On April 30, 1987, petitioner was tried and found guilty of a scheme to defraud in the first degree, count 1, and nine counts of grand larceny in the second degree. Petitioner attempted to testify at trial as an expert in energy management systems. The Court rejected his bid to testify as an expert. Susan Hazelhurst (Hazelhurst), a principal engineer at Xenergy, Inc., of Burlington, Massachusetts, testified as an expert at trial for respondent and assessed the fair market value and the profit potential of the 1982 Energy Brains EB 1-5 and the 1983 Energy Brains A 1-4. Her assessments of the fair market values of the various energy brains were as follows: FAIR MARKET VALUE OF SYSTEM
Fair Market Value Energy Brain Unit
Matching Product (Retail to End User)
1982
EB1
TA 210C
$ 795
EB2
PTI Basic 4
1,295
EB3
Solidyne Micromizer 8000
1,600
EB4
Solidyne Micromizer 3200
2,240
EB5
Aegis ESS24
4,800
1983
A1
TA 210C
795
A2
PTI Basic 4
1,295
A3
Solidyne Micromizer 8000
1,600
A4
Solidyne Micromizer 3200
2,240
*132 OPINION The Commissioner's determinations are presumed to be correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); . The first issue for decision is whether petitioner is entitled to claim a partnership loss, an investment tax credit, and a business energy investment credit because of his alleged participation as a limited partner in Nutmeg 2. Petitioner testified that Saxon purchased from Enersonics an energy system for $ 1,700,000 and that Nutmeg 2 rented the system from Saxon and paid Saxon a $ 195,000 advance rental payment. He next testified that Saxon and Nutmeg 2 entered into an agreement which provided that Saxon passed through to Nutmeg 2 its entitlement to the investment and energy tax credits which arose from Saxon's purchase of the energy system. No such agreement was produced at trial. There are two reasons why petitioner may not prevail in this case. The first reason is that the $ 1,700,000 allegedly paid to Enersonics by Saxon for the energy system in issue is outlandish. The second reason is that Nutmeg 2 never rented any energy *133 system from Saxon. We will first address ourselves to the sale price of $ 1,700,000 allegedly paid by Saxon to Enersonics for the energy system. Sale Price of the Energy System(s)
Petitioner testified that Saxon purchased an energy system from Enersonics for $ 1,700,000. Nutmeg 2 then allegedly rented the system from Saxon and paid an advance rental payment of $ 195,000 to Saxon. Petitioner next testified that Nutmeg 2 rented the energy system to Bob Brown Chevrolet in Des Moines, Iowa. Brown agreed to pay 50 percent of the energy savings effected by the installation of the energy system as rental payment for the equipment. Petitioner initially testified that the energy system installed at Brown was a custom model and had no model number. Respondent's witness, Arthur Jones, founded Iowa Energy Consultants in 1979. In 1980, a salesman who worked for Jones contacted Brown to sell it an energy management system. Jones contacted Frank Leja, who manufactured energy management systems in Massachusetts under the company name of CS&M, to determine what energy systems were available to fill Brown's needs. On April 11, 1983, Brown and Iowa entered into an agreement pursuant *134 to which Iowa installed two energy systems at Brown. The energy systems were an EB-3 and an EB-4 which Iowa had acquired from Frank Leja. The agreement, however, listed the owner of the equipment as Saxon. Respondent's expert witness at trial was Hazelhurst. She was graduated in 1977 from the University of Massachusetts, where she received a B.S. in mechanical engineering. From 1980 through the time of trial, she was employed by Xenergy, Inc., of Burlington, Massachusetts, where she is Director of Engineering. She is responsible for a department of 14 professionals providing engineering metering, evaluation, and design services for utility and end-use customers. She is also responsible for energy management system consulting services and is project manager of utility load planning programs. Xenergy was commissioned by respondent to assess the fair market value and the profit potential to a taxpayer of the Saxon Energy Corp. Energy Brain energy management systems offered in 1982 and 1983. An assessment of the fair market value of the Energy Brain equipment was made using a competitive product evaluation. In such an evaluation, a value is assigned based upon the market price *135 of a matching product. Where a market price is determinable for products similar to the product being valued, the competitive product valuation is preferred to an income stream analysis. In this case, Hazelhurst also analyzed profit potential of the Energy Brain equipment based upon the lease arrangements using a cumulative cash-flow before taxes. Hazelhurst determined the fair market value of the Saxon Energy units offered in 1982 and 1983 as follows: Fair Market Value of System
Fair Market Value Energy Brain Unit
Matching Product (Retail to End User)
1982
EB1
TA210C
$ 795
EB2
PTI Basic 4
1,295
EB3
Solidyne Micromizer 8000
1,600
EB4
Solidyne Micromizer 3200
2,240
EB5
Aegis ESS24
4,800
1983
A1
TA 210C
795
A2
PTI Basic 4
1,295
A3
Solidyne Micromizer 8000
1,600
A4
Solidyne Micromizer 3200
2,240
In her valuation report, Hazelhurst also reported: The potential for the taxpayer making a profit on the lease arrangement before taxes has also been assessed. Without the substantial tax benefits of the investment tax credit and the business energy investment credit based on the Saxon Energy Corporation valuation, the taxpayer can only lose *136 money under the terms of the lease and over the reasonable life of the equipment. A before tax cash flow analysis over an optimistic 15-year life is summarized below: Profit Potential of System
Energy
Before Tax 15 Year
15 Year Net Present
Brain Unit
Net Cash Flow Value of Cash Flow
1982
EB1
-$ 11,476
-$ 9,785
EB2
-  38,025
- 28,322
EB3
-  75,549
- 56,143
EB4
- 113,074
- 83,965
EB5
- 150,599
-111,787
1983
A1 -  51,237
- 17,397
A2 - 126,373
- 41,859
A3 - 251,171
- 82,142
A4 - 592,780
-191,591
We have thoroughly reviewed Hazelhurst's evaluation report, and we are persuaded that Hazelhurst's evaluations are fully documented and professionally determined. Her report establishes that the fair market values of the EB-3 and EB-4 energy units installed at Brown in 1983 were $ 1,600 and $ 2,240, respectively. Petitioner's contention that the energy systems ultimately installed at Brown were purchased by Saxon from Enersonics for $ 1,700,000 is patently ludicrous. The Role of Nutmeg 2 in Placing Energy Systems in Brown's Facilities
On December 23, 1982, Davitian, as general partner, and petitioner, as a limited partner, *137 formed Nutmeg 2 as a limited partnership in the State of New York. Davitian was a certified public accountant and a partner in the certified public accounting firm of Braunfeld & Davitian in New York, New York. His responsibilities as general partner of Nutmeg 2 were to maintain the records of the partnership and to prepare its tax returns. He received all of the information needed to keep Nutmeg 2's books of account and to prepare its tax returns from petitioner. All of Nutmeg 2's alleged financial dealings were orchestrated by petitioner. Nutmeg 2's office was located at Davitian's office at 21 East 40th Street in New York, New York. He never saw the lease allegedly entered into between Nutmeg 2 and Saxon. Nutmeg 2 never received any investor's funds pertaining to any energy systems. The $ 195,000 advance rental payment allegedly made by Nutmeg 2 to Saxon was never disbursed through any Nutmeg 2 account. Petitioner failed to produce at trial the agreement or a copy thereof allegedly entered into between Nutmeg 2 and Saxon. Petitioner testified that Nutmeg 2, in order to facilitate its business and to locate an end user of its energy management system, retained the services *138 of ALH. He further testified that ALH paid Iowa as its agent to enter into an agreement on behalf of Nutmeg 2 to install Nutmeg 2's energy systems at Brown. According to petitioner, the agreement dated April 11, 1983, provided that for every dollar saved through the installation of the energy systems, Brown would pay 50 cents to Iowa on behalf of Nutmeg 2. He also testified that an agreement existed between ALH and Nutmeg 2 which provided that Nutmeg 2 would pay 15 percent of the 50 percent in energy savings it received to ALH to compensate ALH for the services it rendered in finding the location for the energy systems, monitoring the savings, obtaining the payments from the end user, and disbursing the payments to the proper parties. Petitioner did not produce at trial the alleged agreement or a copy thereof between ALH and Nutmeg 2. Jones, the founder and owner of Iowa, testified that a salesman who worked for him first contacted Brown in 1980 to sell it an energy management system. The initial efforts of Iowa to sell Brown an energy management system were unsuccessful, but Jones persisted. Jones contacted Frank Leja, who manufactured energy management systems in Massachusetts *139 under the company name of CS&M. Jones, however, was required to deal with petitioner, who represented Saxon, in order to obtain an EB-3 and an EB-4 energy system. On April 11, 1983, Saxon, as owner of the EB-3 and EB-4 energy management systems, Brown as the end user, and Iowa as the Manager/Dealer, executed an agreement which provided for the installation and management of the energy management systems at Brown. An addendum to the agreement was also executed on April 11, 1983. The agreement and the addendum were signed by James Conlon on behalf of Saxon, Ronald Brown on behalf of Brown, and Arthur K. Jones on behalf of Iowa. Nowhere in the agreement or the addendum is there any reference to Nutmeg 2 or ALH. Jones testified that on April 11, 1983, when he signed the agreement with Saxon and Brown, he had never heard of Nutmeg 2 or ALH. The agreement provided that Saxon was to receive 50 percent of the energy savings effected by the installation of the energy management systems. Jones testified that Iowa was to receive 15 percent of Saxon's 50 percent earnings. Jones further testified that Iowa did not agree to share its 15-percent commission with anyone. Iowa was the sole *140 servicer of the Brown energy management systems. In 1985, Iowa sent to Saxon a check for the energy savings pursuant to the terms of the April 11, 1983, agreement. The check was returned to Iowa by Saxon with instructions that it be reissued to ALH. Iowa reissued the check, payable to ALH, on December 31, 1985. It was during this period that the attorney general of the State of New York was conducting the investigation of petitioner that resulted in his indictment and conviction for conspiracy to defraud in the first degree in his Energy Brain Leasing Program. On its 1982 partnership return, Nutmeg 2 reported $ 2,500 guaranteed payments to partners, an advance rental payment to Saxon of $ 195,000, $ 1,200 paid for professional fees, and $ 1,300 for typing, printing, telephone, and messengers, all resulting in an ordinary income loss of $ 200,000. The partnership also reported that it had total qualified investment in 10-percent property with an unadjusted basis of $ 1,700,000. On his 1982 joint return, petitioner reported a pass-through loss of $ 19,800 from Nutmeg 2, an investment tax credit of $ 17,445, and a business energy investment credit of $ 16,830, all of which were *141 disallowed by respondent. We have already found as a fact that in 1982-83, the fair market values of EB-3 and EB-4 energy management systems were $ 1,600 and $ 2,240, respectively. Petitioner alleges that Enersonics sold the energy management system(s) ultimately installed at Brown to Saxon for $ 1,700,000. There is no evidence in the record that Saxon bought anything from Enersonics other than the energy management system hardware. That petitioner, as the de facto alter ego of Nutmeg 2, would assign a $ 1,700,000 price tag to hardware that could be bought on the open market for not more than $ 3,840 is preposterous. There is not a scintilla of evidence in this record to substantiate petitioner's farrago of absurdity that Nutmeg 2, ALH or he, other than in his role as the operative of Saxon, had anything to do with the installation of the energy management systems at Brown. Petitioner called no witnesses at trial to corroborate the fantasia to which he testified. We do not accept the self-serving and uncorroborated testimony of petitioner. . This is particularly true where petitioner's testimony *142 is predicated on various and sundry alleged legal contracts and agreements, none of which were produced at trial. Transactions that lack economic substance and are conducted for the sole purpose of reducing tax liability are disregarded for tax purposes by the courts. ; ; . The facts and circumstances of this case compel the conclusion that the purported participation by Nutmeg 2 in the installation of the energy management system at Brown was a sham in substance. Nutmeg 2 was not involved in a bona fide business activity which would permit a pass through of any deductions to petitioner. Respondent's disallowance of the pass-through deductions from Nutmeg 2 claimed on petitioner's joint Federal 1982 income tax return is fully sustained. Negligence
In an amendment to answer filed December 21, 1993, respondent asserted additions to tax pursuant to section 6653(a)(1) and (2). Since *143 the additions to tax for negligence were raised by respondent in her amended answer, she bears the burden of proof. Rule 142(a). Section 6653(a)(1) provides for an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides that there shall be added to the tax an amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment which is attributable to negligence or intentional disregard of rules and regulations. Negligence has been defined as a lack of due care or failure to do what a reasonable person would do under the circumstances. , affd. ; . Respondent has clearly shown that the understatement of tax on petitioner's 1982 Federal income tax return was due to negligence at the least. Respondent's determination on this issue is sustained. Valuation Overstatement
Section 6659(a) *144 provides for an addition to tax for an underpayment of tax which is attributable to a valuation overstatement. The addition to tax is an amount equal to the applicable percentage of the underpayment so attributable. As applicable to this case, section 6659(b) provides that if the valuation claimed is more than 250 percent of the correct valuation, the applicable percentage is 30 percent. Where there is a lack of economic substance, section 6659 is applicable because the taxpayer's correct basis in the asset is zero. , affg. . Because the correct basis in the asset is zero, any basis claimed in excess of zero is a valuation overstatement. , affg. ; . Petitioner has failed to prove that his alleged participation as a limited partner in Nutmeg 2 was anything other than a sham. Respondent is sustained on this issue. Substantial Understatement *145 of Tax
Section 6661(a) provides for an addition to tax if there is a substantial understatement of income tax. The amount of the addition to tax is equal to 10 percent of the amount of any underpayment attributable to such understatement. Section 6661(b)(1)(A) provides, in general, that there is a substantial understatement of income tax if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Section 6661(b)(2)(B) provides that the understatement is deemed reduced to the extent it is attributable to (1) the treatment of an item for which there was substantial authority, or (2) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. However, section 6661(b)(2)(C) provides that in cases involving tax shelters, the adequate disclosure provisions do not apply and the substantial authority provisions do not apply unless the taxpayer reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment. Petitioner, who at one time was licensed to practice *146 law and who did in fact practice law, must have known that his alleged participation as a limited partner in Nutmeg 2 was a sham. Respondent is sustained on this issue. We are mindful that section 6661(b)(3) provides that there shall not be taken into account that portion of the substantial understatement on which a penalty is imposed under section 6659, and this will be reflected in the Rule 155 computation in this case. Interest on Substantial Underpayments Attributable to Tax-Motivated Transactions
Section 6621(c) (formerly section 6621(d)) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) if there is a "substantial underpayment" (an underpayment which exceeds $ 1,000) in any taxable year attributable to one or more "tax motivated transactions". The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to that date. , affd. per curiam without published opinion . Congress specifically amended section 6621(c)(3)(A), adding *147 to the list of tax-motivated transactions "any sham or fraudulent transaction." The deductions and credits in this case were disallowed because Nutmeg 2 was a sham. Accordingly, the increased rate of interest under section 6621(c) is applicable. To reflect the foregoing and the settlement of some issues, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the taxable year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. As we have previously noted, Enersonics had no manufacturing facilities. Enersonics obtained its energy conservation equipment from CS&M.↩
2. Does not include initial location fee if service company is retained.↩
1. Does not include income from energy savings.↩